UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

STACY WEEKS

        Plaintiff,

v.                                                    Case No. 10-C-351

OSHKOSH TRUCK CORP., et al.,

        Defendants.

## DECISION AND ORDER DENYING
## MOTION FOR SUMMARY JUDGMENT

This case arises under the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601–2654. Plaintiff Stacy Weeks alleges that Defendants Oshkosh Truck Corporation ("Oshkosh" or "the Company") and Harold Hanson, its FMLA Claims Manager, violated the FMLA by improperly addressing her request for FMLA leave and ultimately terminating her employment. Presently before the court is the defendants' motion for summary judgment. Defendants claim that the undisputed evidence shows that Oshkosh properly handled Weeks request for FMLA leave and that she was terminated for reasons unrelated to the FMLA—namely, thirteen unexcused absences for which FMLA leave had never been sought. For the reasons discussed herein, Defendants' motion will be denied.

## BACKGROUND

Weeks was hired by Oshkosh on January 20, 2003. Oshkosh has a no-fault attendance policy under which employees are assessed points for unexcused absences, coming to work late, or

leaving work early. Points are accumulated on a rolling 12-month basis. Thus, attendance points accumulated by an employee drop off the employee's attendance record after one year. Oshkosh also rewards employees for maintaining good attendance by removing the most recent attendance point from the employee's record if he goes 90 consecutive calendar days without an unexcused absence.

Under the policy, seven or more unexcused absences in a twelve-month period are considered excessive, resulting in the issuance of a written warning. If the employee accumulates eight points, a final warning is given. An employee who accumulates nine or more attendance points within a twelve-month period is subject to termination. Absences that are covered by the FMLA are excused and are not counted against an employee under the policy.

In the fall of 2006, Weeks began submitting requests that certain periods when she was absent or late for work be classified as FMLA leave and thus not counted against her under the Company's no-fault attendance policy. Weeks claimed that she was missing work because she was suffering from primary hypersomnia, a condition characterized by frequent over-sleeping and an inability to wake up normally. On October 5, 2006, Weeks requested leave for October 18 and 19 to undergo diagnostic testing of her condition. (Decl. of Sandra G. Radtke, Ex. 1 (Dkt. # 27-1) at 16.) Weeks explained that the test would last more than 24 hours and could only be done at that time. FLMA Manager Hanson denied Week's request to classify the absences as FMLA, stating that diagnostic testing did not constitute a serious medical condition within the meaning of the FMLA. (*Id.* at 18.)

Weeks went ahead with the test anyhow, and on November 13, 2006, asked Hanson to reconsider his denial. She explained that her attendance/income had suffered for years because her

2

condition had not been properly diagnosed and the test had been necessary so that she could get treatment that would allow her to function normally. (*Id.* at 20.) She supported her request with a Department of Labor ("DOL") Certification of Health Care Provider signed by Dr. Peter Jerome, who practices in the area of pulmonary and sleep medicine. Dr. Jerome noted that the tests had confirmed Week's diagnosis of Hypersomnia, which he stated was a chronic condition that could partially incapacitate her until the correct dosing and frequency of specific medical therapy could be established. (*Id.* at 22.) Hanson maintained the denial and refused to reclassify the absences as FMLA leave.

Weeks was again absent from work from November 17 to 19, 2006, and on November 20, she requested that her absences be classified as FMLA leave. She was absent again on November 21, 2006, and filed a similar application on November 22. Hanson sent Weeks a memo in response to each application requesting that she have her health care provider complete an attached certification to support her request. Pending return of the completed certification, Weeks' absences were tentatively classified as FLMA. (Defendants' Proposed Findings of Fact (DPFOF) ¶¶ 35-38.)

The certification was completed by Dr. Charles Morgan, Weeks' psychiatrist who did not specialize in sleeping disorders, and returned to the company on December 5, 2006. Dr. Morgan identified Weeks' condition as primary hypersomnia, which he described as "an abnormality of sleep physiology causing an abnormally protracted and deep sleep." (Decl. of Harold Hanson, Ex. D.) Dr. Morgan characterized the disorder as a chronic or long-term health condition that would require continuing treatment of a health care provider. He noted that she had had the condition for years but it was not formally diagnosed until she underwent the sleep study on October 19, 2006. In the section of the form requesting a description of how the condition was manifested, Dr. Morgan

3

wrote: "Patient likely to have episodes lasting 1-2 days when she cannot wake up due to this medical condition and on these days will miss a day of work or be late to work." (*Id.*) Asked to indicate which employment functions Weeks could perform during the period over which the absence from work is occurring, Dr. Morgan noted she was incapable of performing any employment functions during such periods. He also stated the condition imposed no work restrictions and would not prevent Weeks from working more than 40 hours a week. By way of treatment, Dr. Morgan anticipated Weeks would require periodic office visits lasting two hours. (*Id.*)

On December 26, 2006, Hanson sent a memo to Weeks acknowledging receipt of Dr. Morgan's certification, but stating that some of the information needed to be clarified before a final determination could be made as to her eligibility for FMLA leave on the dates requested. By this time, Weeks had requested FMLA leave for eight more absences that had occurred since Hanson had requested certification by her health care provider. (Hanson Decl., Ex. E.) Hanson attached to his memo requesting clarification a questionnaire to be completed by Weeks' health care provider. Among the questions the health care provider was asked to answer were whether each of the absences for which Weeks sought FMLA leave was caused by her oversleeping, whether there were methodologies she could use to wake up on time, why an episode would last 1 or 2 days, whether the condition was temporary, whether she could fully perform her duties when awake, and what her sleep schedule was. (Hanson Decl., Ex. F.) Dr. Morgan completed the questionnaire indicating that all of the listed absences were due to her oversleeping, and that the required treatment was medication, which he was in the process of adjusting. He indicated the condition was not temporary but could be effectively managed through medication. He noted that although at

4

times she would have muscle pain after sleeping more than 24 hours, she was generally able to perform all her duties once she was awake. As to her sleep schedule, he noted that she retires at 9:00 p.m. and awakes at 4:30 a.m., but he did not think transferring her to a different shift would help. (*Id.*)

Still not satisfied with Dr. Morgan's response, Hanson sent Weeks another memo on January 22, 2007, to which he attached another questionnaire for her health care provider to complete. Hanson directed Weeks to have the second questionnaire completed and returned by January 30, 2007, or risk having her request to have her absences classified as FMLA leave denied. (Hanson Decl., Ex. G.) Weeks did not request her health care provider to complete the questionnaire because she thought the questions were the same as those he had already answered. When the questionnaire was not returned, Hanson decided to seek a second opinion.

By letter dated February 27, 2007, Hanson advised Weeks that Oshkosh had selected Dr. Jane Sliwinski to evaluate her. Dr. Sliwinski had experience in family and occupational medicine, but did not specialize in sleep disorders. Dr. Sliwinski examined Weeks on March 7, 2007, and issued an initial report shortly thereafter in which she opined that Weeks condition did not require that she be late for work at all. After receiving some additional medical records, Dr. Sliwinski issued a final report in which she confirmed her opinion that Weeks' medical condition did not require employer accommodation and that she would not need to be late for work. (DPFOF ¶¶ 62-64.)

Because Dr. Sliwinski's opinion was in conflict with Dr. Morgan's, Oshkosh decided to obtain a third and conclusive opinion, as the FMLA authorizes. *See* 29 U.S.C. § 2613(d). Oshkosh notified Weeks of its decision to seek a third opinion and proposed that Dr. Sliwinski and Dr.

5

Morgan consult with one another to select a health care provider to conduct the evaluation. Weeks agreed, and Dr. James Gapinski, a sleep disorder specialist, was selected. (DPFOF ¶¶ 67, 68, 73.) For reasons not clear from the record, Dr. Gapinski did not examine Weeks until April 21, 2008, more than a year after Oshkosh had decided to seek a third opinion. (Pl.'s Statement of Fact (PSF) ¶ 20.) By that time, Weeks had submitted almost 50 FMLA leave requests, all related to her hypersomnia. (PSF ¶ 21.)

Following his examination, Dr. Gapinski issued a report in which he concluded that Weeks' history and sleep study were consistent with the diagnosis of hypersomnia. (Id.) Dr. Gapinski stated he "did not feel [Weeks] was disabled or unable to perform her [job] . . . " due to hypersomnia. (DPFOF ¶ 80.) He recommended she alter her medication plan and thought it would be reasonable "to allow her to have sick time while these medications are being titrated upward if she feels that she cannot safely drive due to sleepiness." (PSF ¶ 21.) The report continues: "Whether or not she will be employable will depend on her response to the drugs. I do not feel that she was disabled or unable to perform previously, but her performance was affected by this medical condition." (*Id.*)

Based upon Dr. Gapinski's opinion, Oshkosh advised Weeks by letter dated May 23, 2008, that her requests for FMLA leave due to hypersomnia were denied and her absences would be administered under the Company attendance policy. (DPFOF ¶ 85.) The denial of Weeks' hypersomnia related FMLA requests resulted in the accumulation of approximately 40 attendance points, and the matter was referred to HR for potential disciplinary action. Weeks attended a meeting with HR on May 27, 2008, to discuss whether disciplinary action would be taken. Although the Company could have terminated Weeks under its attendance policy, assuming it was

6

correct in refusing to classify her previous absences as FMLA leave, it decided to afford her a last chance by placing her on probation for one year. Weeks was told that any violation of the Labor Agreement resulting in formal discipline would be cause for immediate termination. Following the meeting, Weeks understood it was important for her to maintain good attendance. (DPFOF ¶¶ 85, 88, 91, 92.)

Between June and July, 2008, Weeks accumulated thirteen additional absences. She did not apply for FMLA leave as to any of them. When she called in to report the absences during this period she identified the reasons as "personal problems," "car problem," or "back problem." At the time, Weeks was working second shift which began at 3:00 p.m. and ended at 11:00 p.m. As to many of the absences, she called in before her shift even began, suggesting that her inability to wake up was not the problem. (DPFOF ¶¶ 93, 94, 98-102.)

As a result of the June/July absences, Weeks was suspended and again referred to HR for possible discipline. At a meeting with HR held on July 28, 2008, Weeks claimed that some of the absences were due to her hypersomnia, but she could not recall which ones. She also admitted that some were due to car problems and a back injury which she does not contend entitles her to FMLA leave. In addition, between May 2004 and August 2006, before she was diagnosed with hypersomnia, Weeks had received 6 verbal or written warnings for excessive unexcused absences under the attendance policy. Oshkosh contends that its decision to terminate Weeks was based on this history and the thirteen additional unexcused absences in June and July while on probation. (DPFOF ¶¶ 106-09, 114-15.)

Weeks filed this action on April 22, 2010. Her complaint alleges that "Defendants intentionally and with willful disregard violated Plaintiff's rights under the FMLA by engaging in

7

a pattern of behavior that interfered with, restrained, or denied the exercise of or attempted exercise of her rights . . . ." (Compl. ¶ 43.) The defendants now move for summary judgment on two grounds. They first argue that the undisputed facts establish that Weeks' applications for FMLA leave were properly handled. Alternatively, the defendants argue that Weeks was terminated for reasons unrelated to her use or attempted use of FMLA leave.

## ANALYSIS

**A. Summary Judgment Standard**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are construed in the light most favorable to the non-movant. *Poer v. Astrue*, 606 F.3d 433, 438–39 (7th Cir. 2010). The purpose of summary judgment is to "dispose of claims that have no factual support" before moving on to trial. *Vukadinovich v. Bd. Of School Trutees of N. Newman Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002). It is not regarded as a "disfavored procedural shortcut, but rather as an integral part of the Federal Rules . . . designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)(internal quotations omitted). The burden of each party for a summary judgment motion depends on whether that party will bear the burden of proof at trial. If, as here, the party seeking summary judgment does not bear the burden of proof at trial, that party must only "identify[] those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. Then the burden shifts to the non-movant to "make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* at 322.

**B. Defendants did not properly handle Weeks request for FMLA leave.**

The FMLA, as applicable here, requires covered employers to provide up to twelve weeks of leave during any twelve-month period to employees who, because of a serious health condition, are unable to perform the functions of their position. 29 U.S.C. § 2612(a)(1)(D). The FMLA defines "serious health condition" as an "illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). The leave may be taken all at once or intermittently. 29 U.S.C. § 2612(b). Where the need for leave is foreseeable based on planned medical treatment, the employee is required to make a reasonable effort to schedule the treatment so as not to unduly disrupt the operations of the employer and provide the employer with not less than 30 days notice if possible. 29 U.S.C. § 2612(e).

An employer may require an employee seeking FMLA leave to submit a medical certification supporting the request. 29 U.S.C. § 2613(a). A medical certification is sufficient under the FMLA if it contains the following information: (1) the date on which the serious health condition commenced; (2) the probable duration of the condition; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition; (4) if the leave is for the employee's own serious health condition, a statement that the employee is unable to perform the functions of her job; and (5) for intermittent leave due to an employee's own serious health condition, a statement of the medical necessity of the intermittent leave, and the expected duration of the intermittent leave. 29 U.S.C. § 2613(b).

In any case in which the employer "has reason to doubt the validity of the certification" the employer may require the employee to obtain the opinion of a second health care provider chosen

by the employer and at the employer's expense. 29 U.S.C. § 2613(c)(1). The only limitation on the health care provider selected by the employer to provide a second opinion is that the health care provider cannot be employed on a regular basis by the employer. 29 U.S.C. § 2613(c)(2). Where the opinion of the second health care provider is in conflict with that of the first, the employer may require the employee to obtain, at the employer's expense, the opinion of a third health care provider mutually agreed upon by the employer and the employee. The opinion of the third health care provider is considered final and binding on both the employer and the employee. 29 U.S.C. § 2613(d).

The FMLA makes it unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the FMLA]." 29 U.S.C. § 2615(1). For an employee to establish an FMLA interference claim, he must prove: "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *See Burnett v. LFW, Inc.*, 472 F.3d 471, 477 (7th Cir. 2006). The requirements for employee eligibility and employer coverage under the FMLA are set forth in the Act and are not at issue here.

The initial dispute here is over whether Weeks was entitled to FMLA leave. "An employee is entitled to FMLA leave if (1) he is afflicted with a 'serious health condition' and (2) that condition renders him unable to perform the functions of his job." *Id.* at 477-78 (quoting 29 U.S.C. § 2612(a)(1)(D)). The defendants argue on the basis of the third and final opinion of Dr. Gapinski that Weeks was not entitled to FMLA leave and for this reason alone her action should be dismissed.

10

Plaintiff sharply criticizes Hanson's handling of her request for FMLA leave due to her hypersomnia. She contends that he improperly denied her leave for the sleep tests which were needed to confirm her condition because of his erroneous belief that the FMLA did not apply to leave sought for purposes of diagnostic testing. She also argues that his requests for clarification of the certification provided by Dr. Morgan were unnecessary and called for information an employer is not entitled to under the FMLA. Weeks argues that the Company's request for a second opinion was improper because there was no reason to doubt Dr. Morgan's certification. Finally, she contends that Dr. Gapinski's opinion, even if final, doesn't address the ultimate question of whether her absences were necessitated by a serious health condition.

Plaintiff is correct that the FMLA can cover leave for diagnostic testing needed to determine whether an employee has a serious health condition. The DOL regulations in effect at the time,[1] which neither party challenges, defined "serious health condition" to include "continuing treatment by a health care provider" due to a "chronic serious health condition. 29 C.F.R. § 825.114(a)(2)(iii). Treatment, as defined in the regulation, includes "examinations to determine if a serious health condition exists and evaluations of the condition." 29 C.F.R. § 825.114(b). Thus, if in fact Weeks was suffering from a serious health condition, she was entitled to FMLA leave for the time she needed off in order to undergo the diagnostic testing needed to confirm the diagnosis. Hanson's rejection of her request for leave because the FMLA does not cover time off for diagnostic tests was in error.

Plaintiff is also correct that the additional information Hanson sought by way of "clarification" was beyond the scope of what the employer is entitled to under the FMLA. The DOL developed

---

[1] The regulations have since been revised.

11

a form (WH-380) for employees' use in obtaining the medical certification from health care providers that met FMLA requirements. Employers are free to use the DOL form, or their own form requesting the same basic information, but employers are not allowed to obtain additional information. 29 C.F.R. § 825.306(b). The questionnaire Hanson directed Weeks to have her health care provider complete called for information, such as why an episode would last 1 or 2 days, why the condition had just started manifesting itself, and what her sleep schedule was, that went beyond what the employer was allowed to obtain from her him. More importantly, the regulations require that when an employer finds a certification incomplete, the employer is to so advise the employee and "provide the employee a reasonable opportunity to cure any such deficiency." 29 C.F.R. § 825.305(d). In this case, Hanson never explained to Weeks precisely in what respect her doctor's certification was deficient. Instead, he directed her to request from her doctor more information than the FMLA authorized him to obtain.

Weeks' is mistaken, however, in arguing that Oshkosh was not entitled to request a second opinion. The statute expressly authorizes the employer to request a second opinion whenever it has "reason to doubt the validity of the certification" provided by the employee's health care provider. 29 U.S.C. § 2613(c). Weeks suggests that because the certification completed by Dr. Morgan was legally sufficient, Oshkosh had no basis to ask for a second opinion. But nothing in the FMLA says that an employer is required to take the employee's doctor's word that his patient cannot come to work at face value. Here, Oshkosh was being told by Weeks' psychiatrist, who appears to have had no expertise in sleep disorders, that she would be missing work with no forewarning for one to two days at a time for an undetermined duration because she could not wake up. It is not surprising that Oshkosh wanted a second opinion. To a lay person like Hanson, it must have appeared that Weeks

12

was requesting a license to sleep in and come to work when she felt like it. Given the fact that people are not angels and this world is not heaven, Oshkosh had ample reason to request a second opinion.[2]

Weeks next challenges Oshkosh's selection of Dr. Slawinski to provide the second opinion. She contends that because Dr. Slawinski did not specialize in sleep disorders, Hanson's selection of her appears suspect. She also notes that Dr. Slawinski's report, as well as Dr. Gapinski's, did not address the criteria for FMLA, but instead offered treatment plans of their own. Moreover, Dr. Gapinski seemed to believe he was evaluating Weeks to determine whether she was disabled. He concluded that she was not disabled but did not address the issue of whether her condition had required her to take intermittent leave in the past, suggesting instead that she would need some "sick time" in the future while her medications are being adjusted. (*Id.*, Ex. K at 4.)

The fact that Dr. Slawinski did not specialize in sleep disorders would not seem by itself a violation of the FMLA, especially since there is no evidence that Dr. Morgan specialized in such disorders. As to the scope of Dr. Slawinski's evaluation, however, it appears Weeks has more of a point. It does not appear that Oshkosh provided Dr. Slawinski or Dr. Gapinski with the form the DOL developed for obtaining medical certification under the FMLA. *See* 29 C.F.R. § 825.306(a) (stating that WH-380 is to be used for second and third opinions). As a result, Dr. Slawinski's and

---

[2]At least one court has held that FMLA leave is not available for chronic tardiness, even if caused by a medical condition. *See Brown v. Eastern Maine Medical Center*, 514 F. Supp.2d 104, 110 (D. Me. 2007) ("To be sure, getting to work on time is an important part of a nursing technician's job function. But to treat chronic lateness, even if caused by a medical condition, as an incapacity, or inability to perform, that requires intermittent "leave" for the brief duration of the lateness, distorts the English language and trivializes the purpose of the Act."); *see also Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1007 (7th Cir.2001) (noting that "Courts have been reluctant to read the FMLA as allowing unscheduled and unpredictable, but cumulatively substantial, absences, when the Americans with Disabilities Act protects only persons who over the long run are capable of working full time"). This issue is not before me at this time.

13

Dr. Gapinski's reports of their respective examinations were not focused on the FMLA criteria and included far more information concerning Weeks than Oshkosh was entitled to obtain. Both physicians appear to have viewed Weeks as their own patient and offered her their treatment recommendations.

Neither physician suggested that Weeks did not have hypersomnia, although they offered no opinion on whether hypersomnia constitutes a serious health condition. In answer to the question "What is a reasonable amount of time for [Weeks] to be expected to miss work due to her primary hypersomnia?", Dr. Slawinski stated "None. She will not need to be late for work at all." (Hanson Decl., Ex. H at 4.) This was in conflict with Dr. Morgan's opinion, and thus Oshkosh was justified in requesting a third opinion. Oshkosh's reliance upon Dr. Gapinski's opinion to deny Weeks' request for FMLA leave is more problematic, however.

Dr. Gapinski stated in his report that he "did not feel [Weeks] was disabled or unable to perform previously but her performance was affected by this medical condition." Oshkosh seized upon this language as a rejection of Weeks' claim that she was unable to come work on various occasions over the previous year-and-a-half. But saying she was not disabled is not the same as saying that she did not have a medical condition that intermittently prevented her from coming to work. Indeed, the fact that Dr. Gapinski thought she would need some "sick time" as she adjusted to the medication regime he recommended suggests that he believed her condition would require some absences. As Plaintiff observes, this would have been a proper occasion for Hanson to seek clarification. Instead, he summarily rejected all of Weeks' pending FMLA leave requests due to hypersomnia, resulting in the immediate accumulation of 40 attendance points.

14

I am unable to conclude as a matter of law on the basis of this evidence that Oshkosh properly handled Weeks' request for FMLA leave. Dr. Gapinski's opinion lacks the clarity and specificity necessary for it to be considered final and binding on the question of whether Weeks' absences were due to a serious health condition. Accordingly, the defendants motion for summary judgment on the ground that she does not have such a condition is denied.

**C. A Factual Dipute Exists Over Whether Weeks Was Terminated As A Result Of Her Attempt To Use FMLA Leave.**

Oshkosh next argues that the undisputed evidence establishes that Weeks was terminated for reasons unrelated to her attempted use of FMLA leave. Oshkosh points to the fact that even though it believed it had grounds to terminate Weeks under its no-fault attendance policy based on Dr. Gapinski's opinion, it did not do so. Instead, Oshkosh decided to place Weeks on probation, and she was not terminated until she accumulated thirteen additional absences, none of which were claimed at the time to be due to reasons for which FMLA leave could be granted. Because Oshkosh was entitled to terminate Weeks under its attendance policy after nine unexcused absences, Oshkosh argues that its previous handling of Weeks' FMLA leave requests is irrelevant.

Plaintiff, on the other hand, notes that Weeks was placed on probation as a direct consequence of the denial of her applications for FMLA leave, and her termination was for violating the conditions of her probation. Thus, she argues, Oshkosh's decision to terminate her was directly related to her attempted use of FMLA leave. Weeks also contends that Hanson's interference with her attempts to exercise her rights under the FMLA and the resulting delay in the determination of

15

her applications had a chilling effect that prevented her from submitting requests for addition FMLA leave after her earlier requests were denied.

Although Oshkosh denies that it considered Weeks' earlier absences due to her hypersomnia in deciding to terminate her employment, a jury could conclude otherwise on the basis of the evidence of record. In her letter summarizing the disciplinary meeting at which Weeks was terminated, Oshkosh HR Senior Associate Katie Engleman stated that she told Weeks that she was being terminated for violating her probation. But Weeks was placed on probation because Oshkosh concluded she was not entitled to FMLA leave for hypersomnia. If she was improperly placed on probation as a result of Oshkosh's mishandling of her earlier requests for FMLA leave, then it seems that her termination was at least in part because of her attempts to exercise her rights under the FMLA.

It is true that under its attendance policy, Oshkosh would have had the right to terminate Weeks after the thirteen additional absences, regardless of whether she was on probation or not. It is not clear, however, that it would have done so had it not been for the fact she was on probation due to the 40 attendance points she had accumulated as a result of the rejection of her previous FMLA leave requests. The attendance policy called for progressive discipline, the problem was to be addressed first with a written warning and then a final warning before an employee would be discharged for excessive unexcused absences. The record suggests that Weeks received neither. Of course, it may be that since Weeks accumulated the 13 new unexcused absences in only two months, the requirement of a written and final warning can be dispensed with. But nothing in the record suggests that is the case. More likely, Oshkosh felt that it had given her more than sufficient warning when it met with her after rejecting her FMLA leave requests. In any event, Engleman

16

advised Weeks that she was terminated for violation of her probation, not excessive unexcused absences. If that is the case, then it would seem that her previous attempts to exercise her rights under the FMLA was a factor in the decision to terminate her. I conclude that this issue, as well, is one for a jury to decide.

Accordingly, the defendants' motion for summary judgment is denied. The Clerk is directed to set this matter on the Court's calendar for scheduling of a trial and pretrial.

**SO ORDERED** this   23rd   day of November, 2011.


                                                s/ William C. Griesbach
                                                William C. Griesbach
                                                United States District Judge